**In re Bruce A. LOFTY, Beverly J. Lofty, Debtors.**

**No. 09–37271.**

United States Bankruptcy Court, S.D. Ohio, Western Division, at Dayton.

Sept. 30, 2010.

Charles J. Roedersheimer, Lester R. Thompson, Dayton, OH, for debtors.

### Decision Denying Confirmation of the Debtors' Amended Chapter 13 Plan

GUY R. HUMPHREY, Bankruptcy Judge.

## I. Introduction

This decision concerns whether the debtors' Chapter 13 plan of reorganization should be confirmed. For the reasons set forth below, the court determines that it should not be confirmed.

The following constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. The findings of fact are derived from Debtor Beverly J. Lofty's testimony at the confirmation hearing held on June 3, 2010 (the "Hearing") and the record in this matter. In making its determination, the court also considered the arguments of counsel at the Hearing, the debtors' Schedules (A–J) and Statement of Financial Affairs (Doc. 1) and Amended Schedules (Doc. 63), the debtors' amended Chapter 13 Plan (Docs. 9, 34, & 55) ("Plan"), the *Chapter 13 Trustee's Objection to Confirmation of Plan and Request for Denial of Confirmation* (Doc. 58) ("Trustee" and "Trustee Objection"), and the post-hearing memoranda submitted by the Trustee (Doc. 74) ("Trustee's Brief") and the debtors (Docs. 77 and 80) ("Debtors' Brief"),

## II. Procedural Background, Findings of Fact, and Positions of the Parties

### A. Findings of Fact

The debtors, Bruce A. Lofty and Beverly J. Lofty ("Debtors"), live in a 2002 Safari Coach Motor Home (the "Motor Home"). Approximately five to six months a year, the Debtors park the Motor Home at one of the parcels of real estate they own, a property known as 3345 Powers Road, Jamestown, Ohio, where their daughter lives with her family ("Powers Road Property"). At least in part, due to Ms. Lofty's arthritis, the Debtors spend the winter months in the southern part of the United States, previously in Florida, but are more likely to spend the winter in Texas in the future. The Motor Home has the following expenses:

- $1,216 each month (secured claim of $59,000/60 months)
- $50 each month ($600 yearly campground cost)

- $50 each month (gasoline costs for year are about $600)
- $440 each month (lot rent in Texas or Florida for the winter)[1]
- $100 each month (maintenance)

Overall, the evidence shows the Motor Home costs approximately $1,900.00 each month.

The Debtors purchased the Powers Road Property in 2004 because their daughter did not have sufficiently good credit to obtain a mortgage loan. However, the Powers Road Property adds no expense to the Debtors' budget. The mortgage is paid by the Debtors' daughter paying rent to the Debtors. The rent covers the mortgage, taxes and insurance. The daughter handles all the maintenance on the Powers Road Property. This arrangement has remained consistent since the Powers Road Property was purchased. The Trustee has not objected to the Debtors' retention of the Powers Road Property.

The Debtors also own a parcel of real estate known as 3855 N. Lakeshore Drive, Jamestown, Ohio ("Lakeshore Property"). The Lakeshore Property is occupied by the Debtors' adult son and adult grandson.

The secured claim on the Lakeshore Property would require payments of over $800.00 per month ($43,500 / 60 months), plus interest.[2] The Debtors are responsible for, at a minimum, an additional $347.65 each month for insurance, property taxes and utilities (Doc. 77, p. 4). The Debtors need to pay for any maintenance on the Lakeshore Property since their son and grandson who live at that property cannot afford to do so. Conservatively, the Debtors' monthly expenses for the Lakeshore Property are $1,100 for the next five years, and the Debtors only receive $600 in rent, $400 from the Debtors' son and $200 from the Greene Metropolitan Housing Authority. The net cost of this property to the Debtors or the bankruptcy estate over the life of the Plan is $30,000 or more.

According to their Amended Schedule I (Doc. 55), the Debtors' income is mostly fixed.[3] The Debtors receive a total of $1,464 in monthly social security payments and Mr. Lofty receives $1,444.56 in monthly workers compensation payments and $2,504.82 in other retirement income. Mr. Lofty has had various health issues and is now retired. Including the $1,250 in rental income, total monthly income for the

---

1. This figure estimates the lot rent from evidence presented concerning lot rentals in Florida. Ms. Lofty hoped the Texas lot rent payments would be less, but there was no definitive evidence.

2. The parties did not provide, nor did the Plan indicate a monthly payment for the secured claim on the Lakeshore Property. The Debtors, through the Plan, agreed to pay 1.5% above the Money Rate in the Wall Street Journal at the time of confirmation (See Doc. 9, ¶ 8). An amortization of the secured claim suggests a figure in excess of $800.00 each month.

3. The Debtors are above-median income debtors for the State of Ohio. Both the Trustee and the Debtors relied on the Debtors' actual income and expenses at confirmation as re-

flected by Schedules I and J to determine disposable income and projected disposable income, which varied greatly from those set forth on the Debtors' Official Form 22C (Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income). The court is not opining on whether such complete reliance on Schedules I and J to determine a debtor's disposable income and projected disposable income is appropriate. See *Hamilton v. Lanning,* —— U.S. ——, 130 S.Ct. 2464, 2478, 177 L.Ed.2d 23 (2010) ("We hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation.").

Debtors is $6,663.38. Ms. Lofty has two potential sources of income, but neither of them is stable or likely to continue in a significant way. Ms. Lofty earns some income when in Ohio as a substitute registered nurse, but due to her arthritis her future income as a nurse is very limited. Specifically, in July 2010, she was planning on working one day. In addition, Ms. Lofty has sold a health insurance product for individuals living in recreational vehicles but the economy has drastically reduced her income from such sales. In the Debtors' Brief, an additional $100 each month of income was included. Upon questioning by counsel for the Trustee, Ms. Lofty agreed such future income was speculative.

### B. Procedural Background

On November 17, 2009 the Debtors filed a Chapter 13 petition (Doc. 1) and a Chapter 13 plan (Doc. 9). Under the original plan, the Debtors proposed to pay to the Trustee $2,477 each month for 60 months to fund payments under the Plan. As originally filed, nonpriority unsecured creditors would not receive any payment on account of their allowed claims.

On March 3, 2010 in response to various objections, the Debtors amended the original plan (Doc. 34) to increase the monthly payment to $2,727 and to pay an 8 % dividend to nonpriority unsecured creditors. In addition, the Debtors proposed that funds used to maintain two other parcels of real property being surrendered be paid to the Trustee as additional plan pay-

ments. On April 19, 2010 the Debtors filed a further amendment, raising the monthly payment to $2,758 and lowering the dividend for nonpriority unsecured creditors to 7 %.[4]

Under the Plan, the Debtors propose to retain a 2007 Dodge Dakota and pay $422 each month (including interest) on this secured claim. In addition, the Plan provides for the retention of the Motor Home, with the Debtors paying $59,000 (representing the value of the Motor Home on the Petition Date) plus interest over the life of the Plan as a secured claim and the balance, approximately $75,000, as an unsecured claim.

The Plan also provides for the Debtors' retention of the Powers Road Property, with the Debtors directly paying the monthly mortgage payments of $644.39 outside the Plan. The Plan indicates that the Debtor's daughter pays rent of $650 each month and the Debtors park the Motor Home there six months a year. The Debtors also intend to file an adversary proceeding post-confirmation to avoid a second mortgage on the Powers Road Property as wholly unsecured.

The Plan also contemplates the retention of the Lakeshore Property. The Plan states that the Debtors owe $59,736 on the mortgage loan for this property and, as amended, proposes to pay $43,500 on this loan as a secured claim and the remaining balance as unsecured.

All objections to confirmation of the Plan other than the Trustee's Objection were resolved by the date of the Hearing.

---

4. The Debtors assert their plan may pay nonpriority unsecured creditors 12 %, but it is the Debtors' most recent plan amendment (Doc. 55) that reduced the dividend from 8 % to 7 %. As noted in the Debtors' post-hearing memorandum (Doc. 77, p. 6), administrative expenses may be higher than normal in this case. Total scheduled nonpriority unsecured debt (Doc. 1, Schedule F) is $151,867.17. In addition, the deficiency claims on the Motor Home and the parcels of real property, and the potential wholly unsecured second mortgage potentially add significant unsecured debt. Depending on the filed proofs of claim, the Debtors' filings show that this case could have over $250,000 in nonpriority unsecured debt, not including any deficiency claims on surrendered real property.

## C. Positions of the Parties

The sole issue raised in the Trustee's Objection is whether the Plan was proposed in good faith. *See* 11 U.S.C. § 1325(a)(3)[5] ("... the court shall confirm a plan if— ... the plan has been proposed in good faith and not by any means forbidden by law") (Docs. 27, 40 & 58).[6] Specifically, the Trustee asserts the Plan was not proposed in good faith for the following reasons:

1) Feasibility of the Plan is questionable because the monthly payment to be made to the Trustee to fund the Plan "leaves no excess for surplus" and any income attributed to Ms. Lofty is speculative.

2) The Debtors' schedules are inaccurate to the extent that they over-estimate Ms. Lofty's income.

3) While admitting that the Debtors' "lifestyle is not extravagant," the Trustee asserts that the unsecured creditors are being unfairly treated because "the secured creditors will be getting somewhere between 40% and 50% of debtors' net income, while unsecured creditors will get 7%." Particularly, the Trustee notes that one of the parcels of real estate will be paid for over the life of the Plan, leaving it free and clear of liens once all the payments are made, thus inuring to the Debtors' benefit and to the detriment of the unsecured creditors. The Trustee also asserts that the Motor Home is an unnecessary and unwise expense, with the Debtors "living [their] dream" at the unsecured creditors' expense. The Trustee argues that "the debtors are their own worst enemy in this plan," particularly as relates to their retention and payment of the costs associated with the depreciating Motor Home. *See* Trustee's Brief, p. 12.

4) The payment of the secured claims frees up equity in the corresponding collateral and provides the Debtors with a "head start versus a fresh start" in light of the small dividend to be paid to nonpriority unsecured creditors, raising issues with the Debtors' sincerity in proposing the Plan and their "abusing the spirit of the Bankruptcy Code."

The Debtors respond that: a) the Powers Road Property does not cost the unsecured creditors anything because the Debtors' daughter pays all of the costs related to that property; b) the Debtors have a moral obligation to take care of their son and grandson living at the Lakeshore Property "who are basically their dependants" by paying any of their expenses or costs associated with the Lakeshore Property that do not get paid by the son or governmental or social agencies; and c) if the Plan is not confirmed, the Debtors will "have no incentive to continue in the Chapter 13" because all of their income is exempt from execution.

## III. Legal Analysis

### A. Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

---

5. Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101–1532 (the "Code"), cited hereinafter in this decision as "§ ——".

6. The Trustee's Objection did not raise 11 U.S.C. § 1325(a)(7), which requires the petition to have been filed in good faith. This confirmation requirement was added as part of the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Other issues raised in the Trustee Objection (Doc. 9) were apparently resolved and were not pursued by the Trustee at the Hearing.

## B. The Burdens With Respect to an Objection to Confirmation

■ The objecting party has the initial burden to produce evidence in support of an objection. *In re Henry*, 328 B.R. 529, 538 (Bankr.S.D.Ohio 2004). The Debtors have the ultimate burden of proof to show the requirements of 11 U.S.C. § 1325 have been met. *Id.; In re Hogue*, 78 B.R. 867, 872 (Bankr.S.D.Ohio 1987); and *In re Carver*, 110 B.R. 305, 311 (Bankr.S.D.Ohio 1990) (Cole, J.). *See also Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir.1990) ("*Caldwell II*"); *Ed Schory & Sons, Inc. v. Francis (In re Francis)*, 273 B.R. 87, 91 (6th Cir. BAP 2002).

## C. The Debtors' Plan Cannot Be Confirmed Because It Violates § 1325(b)(1)(B)

■ The Debtors' Plan cannot be confirmed because it does not commit all of their projected disposable income to be received during the life of their Plan to payment of unsecured creditors as required by § 1325(b)(1)(B). Section 1325(b)(2)(A)(i) only allows reasonably necessary expenses for the maintenance and support of the Debtors and a "dependent of the debtor" in arriving at what would be "projected disposable income." *See generally* Keith M. Lundin, Chapter 13 Bankruptcy, 3d, Vol. 2, § 165.2 (2000 and Supp. 2004).

■ Section 1325(b) provides in pertinent part as follows:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

    \* \* \* \*

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i) **for the maintenance or support of the debtor or a dependent of the debtor,** or for a domestic support obligation, that first becomes payable after the date the petition is filed[.]

11 U.S.C. § 1325(b) (emphasis added). Thus, all of the Debtors' projected disposable income during the life of the Plan must be applied to make payments to the unsecured creditors under the Plan and in computing projected disposable income, only expenses for the Debtors and their dependents may be deducted.

The Debtors are retaining two parcels of real property and the Motor Home, which is the Debtors' home. The Powers Road Property "cash flows" and is not maintained at the expense of the Debtors' nonpriority unsecured creditors because the Debtors' daughter pays all of the costs associated with that property. Thus, no projected disposable income will be used in relationship to that property. The same is not true for the Lakeshore Property occupied by the Debtors' son and grandson.

The expenses of the Lakeshore Property are not reasonably necessary for the Debtors or their dependents. The Debtors'

efforts to assist their son and grandson are certainly noble and the court does not take issue with the Debtors' moral obligation to assist them. However, the Debtors never established that the son and grandson were legal dependents entitled to disposable income at the expense of nonpriority unsecured creditors.

The evidence established that the Lakeshore Property was purchased for the Debtors' son and grandson, but not that they were "dependents" of the Debtors as that term is used in § 1325(b). Ms. Lofty testified that the grandson was a "fire starter" when he was younger and therefore it was difficult for the son to find a place to rent. The son suffers from depression and Krohn's disease. Ms. Lofty also testified that the son and grandson had no other place to live. The Debtors refer to the son and grandson in their post-hearing brief as "basically their dependents." Doc. 77, p. 6.

■ The evidence does not support a finding that the Debtors' adult son and grandson are dependents as that term is used in § 1325(b). The Bankruptcy Code does not define the term "dependent." However, more than a purely moral obligation is required to qualify as a dependent as that term is used in § 1325(b). See In re Clements, 185 B.R. 903 (Bankr. M.D.Fla.1995) (Debtors could not spend funds to help a 32 year old daughter, who was a recovering alcoholic and the sister of one of the debtors, who had cerebral palsy and lived in a nursing home. Debtors had no legal obligation to provide such support). Moreover, the record does not show any legal requirement to support the son and the grandson nor are these relatives listed as dependents on the Debtors' schedules. See Doc. 55, Amended Schedule I. The record also lacks any evidence that the Debtors claim these relatives as dependents for tax purposes or any other

objective standard this court could apply. Cf. In re Tracey, 66 B.R. 63, 66–67 (Bankr. D.Md.1986) (Debtors claimed mother as a dependent on their tax return and the court used the definitions of dependent in the I.R.S. Code as a guide, considered the purpose of § 1325(b) and allowed the mother to live in a home rent-free. The home had a rental value of $175.00 each month and a mortgage payment of $342 each month). Further, Ms. Lofty's testimony that no other housing options for the son and the grandson were available and that they relied on this housing was not persuasive. Cf. Leslie Womack Real Estate, Inc. v. Dunbar (In re Dunbar), 99 B.R. 320, 324 (Bankr.M.D.La.1989) ("[T]his Court interprets the reference to 'dependents'... to mean a person who reasonably relies on the debtor for support and whom the debtor has reason to and does support financially.").

■ Without adopting a specific test for dependents, it is sufficient to note that the record only shows a moral obligation of the Debtors to support their son and grandson. The evidence did not establish that the Debtors' son and grandson were dependents of the Debtors under any recognized legal definition of "dependent." Accordingly, the use of projected disposable income to support them violates § 1325(b)(1)(B) and the court cannot confirm the Plan.

**D. The Debtors' Plan Cannot Be Confirmed Because It Violates § 1325(a)(3)**

1. *Sixth Circuit Law Regarding the Good Faith Requirement of § 1325(a)(3)*

■ The Bankruptcy Appellate Panel for the United States Court of Appeals for the Sixth Circuit summarized the Sixth Circuit's good faith decisions in *In re Francis,* 273 B.R. 87 (6th Cir. BAP 2002).

The Sixth Circuit has indicated that "a debtor's pre-petition conduct is but one element" and that bankruptcy courts must look to the totality of the circumstances in determining a debtor's good faith in filing a chapter 13 petition and plan. *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030, 1033 (6th Cir.1988). In *Caldwell II* the Sixth Circuit set forth a twelve-part test to determine whether a debtor's Chapter 13 plan was proposed in good faith:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increase in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment within classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and,

(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*Caldwell II,* 895 F.2d at 1126–27. The *Caldwell II* factors merely serve as guidelines for determining good faith. *In re Sharon,* 200 B.R. 181, 196 (Bankr.S.D.Ohio 1996). Good faith does not necessarily require a substantial payment to unsecured creditors. *Francis,* 273 B.R. at 92. Further, the good faith determination is not simply a matter of counting the factors favoring good faith and numerically weighing them against those factors indicating a lack of good faith. *In re Gelvin,* 1994 Bankr.LEXIS 1978 (Bankr.S.D.Ohio Nov. 23, 1994). "[C]lose proximity in time between a debtor's purchase of collateral and the filing of a Chapter 13 may evidence a lack of good faith." *Henry,* 328 B.R. at 539 (internal citations omitted). In summarizing the § 1325(a)(3) good faith analysis, the Sixth Circuit stated that:

Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment.

*Okoreeh–Baah,* 836 F.2d at 1033.

The totality of the circumstances test set forth in *Caldwell II* and expounded upon in *Okoreeh–Baah, Francis* and their progeny require analysis of both the subjective good faith and the objective good faith of debtors. Thus, factors 4, 7, 9, 10, and 12 listed above have at least some element of scienter relating to as-

sessing the debtor's motive, intent, and conduct in pursuing a Chapter 13 plan. The other factors are more focused on an objective analysis of the plan—the fundamental fairness of the plan, whether it achieves the purposes of the Bankruptcy Code and particularly Chapter 13, and the probability that the plan will be successful.

In several different decisions the Northern District of Illinois has recognized the distinction between "subjective" and "objective" good faith relating to Chapter 11 and Chapter 13 cases. Thus, in *In re Mandalay Shores Coop. Hous. Assoc., Inc.*, 63 B.R. 842, 847–48 (N.D.Ill.1986), United States District Judge Milton I. Shadur stated:

> Of course the term "good faith" can be defined in several ways, and its legal significance depends on its legal context. Frequently a distinction is made between "subjective" and "objective" good faith, the former indicating an individual's actual state of mind and the latter a reasonable person's hypothetical state of mind in given circumstances. Subjective good faith without its objective counterpart is often called the "pure heart-empty head" phenomenon [citation omitted].
>
> Perhaps one reason Congress took the term "good faith" out of Section 1112(b) was to avoid the confusion created by intertwining subjective and objective inquiries. It may easily happen a corporation will argue it filed a petition with a pure heart, but the creditors will argue the petition was filed with an empty head....
>
> \* \* \* \*
>
> But mere obedience to court orders—important though that is—cannot salvage a merit less action. And what goes under the name of an "objective good faith" inquiry under Chapter 11 really amounts to analysis of the merits of the

debtor's claim of entitlement to reorganization. Most of Chapter 11 deals with the mechanics of a reorganization, assuming that form of relief is appropriate. Section 1112(b) and its associated "good faith" doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score dismissal of a Chapter 11 petition—like dismissal of any lawsuit—is not imposed principally as a sanction for bad intentions or obstreperous behavior. Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks.

This distinction was further expounded upon in *In re McCormick Road Assocs.*, 127 B.R. 410, 415 (N.D.Ill.1991):

> As the court in *California Sound Systems* [69 Bankr.893, 901 (Bankr.S.D.Cal. 1987) ] observed, "the appellation 'bad faith filing' is perhaps a misnomer in that it implies the existence of ill will or malicious conduct on the part of debtor prior to filing for relief." 69 Bankr. [B.R.] at 901 n. 2. In the Northern District of Illinois the determination of whether a bankruptcy petition is filed in good faith is made by an analysis of objective standards geared toward evaluating "whether reorganization is the proper course of action in a particular debtor's case." *In re Mandalay Shores Cooperative Housing Assoc., Inc.*, 63 Bankr. [B.R.] 842, 848 (N.D.Ill.1986). A dismissal under this criterion is by no means synonymous with a finding that a case was filed with intent to harass a creditor.

*See also Elmwood Dev't Co. v. General Elec. Pension Trust (In re Elmwood Dev't Co.)*, 964 F.2d 508, 512 (5th Cir.1992) ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to

testimony of the subjective state of mind of Elmwood's manager.") and *In re Tillotson*, 266 B.R. 565, 571–72 (Bankr.W.D.N.Y. 2001) (Second Chapter 11 case was an "impermissible effort to modify the prior plan ... and without 'objective' good faith in the form of 'fundamental fairness.'"). In *McCullough v. Brown*, 162 B.R. 506, 510 (N.D.Ill.1993), an appeal involving treatment of unsecured student loan obligations in Chapter 13 plans, Judge Shadur referenced the "objective good faith" and fundamental fairness concepts involved in assessing Chapter 13 plans.

The concept of a Chapter 13 case and a Chapter 13 plan being filed in "objective good faith" has been more recently discussed in the context of motions to extend the automatic stay under § 362(c)(3)(B) and to impose a stay under § 362(c)(4).[7] In *In re Ferguson*, 376 B.R. 109, 124 (Bankr.E.D.Pa.2007) the court addressed the good faith issue under §§ 362(c)(3) and (4) and after surveying cases from other jurisdictions, concluded that "the courts have devised various 'checklists' of good faith factors" and then listed 14 such factors. Those 14 factors are essentially the *Caldwell II* factors with a couple different factors added. The court then noted that a couple of the factors relate to the debtor's subjective good faith, but that most of them relate to the debtor's objective good faith. *Id* at 124, n. 27. *See also In re Thornes*, 386 B.R. 903, 910–11 (Bankr. S.D.Ga.2007) ("Having a case dismissed and then re-filed due to attorney error certainly supports the notion that Debtor has no subjective bad faith or malice, but even assuming that Debtor has good faith motives and a sincere intent to repay his creditors, he must first prove that [his third case] meets the objective good faith standard in order to gain the benefit of the automatic stay.").

▮ Accordingly, determination of the Debtors' good faith in proposing the Plan

---

7. Section 362(c)(3), in pertinent part, states: (3) if a single or joint case is filed by or against debtor who is an individual in a case under chapter 7, 11, or 13 ... and if a single or joint case of the debtor was pending within the preceding 1–year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b) [11 USCA § 707(b)]—

   (A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

   (B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30–day period **only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed** ...

   11 U.S.C. § 362(c)(3) (emphasis added). Section 362(c)(4), in pertinent part, states:

   (4) (A)(i) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under section 707(b) [11 USCA § 707(b)], the stay under subsection (a) shall not go into effect upon the filing of the later case; and

   (ii) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

   (B) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, **only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed** ...

   11 U.S.C. § 362(c)(4) (emphasis added).

as required under § 1325(a)(3) entails an analysis of the totality of the circumstances of the Debtors' case, with particular attention paid to the factors set forth in *Caldwell II*. Further, while the Plan may have been proposed with all of the right motives and intent—that is in subjective good faith, it still may not pass muster under *Caldwell II, Okoreeh–Baah*, and *Francis* if it can not survive scrutiny under the objective good faith factors set forth in those cases, paying particular attention to whether it is fundamentally fair, achieves the purposes of the Bankruptcy Code and particularly Chapter 13, and will likely be successful.

### E. Analysis of the Good Faith Factors and Issues

■■■ The Trustee admits that the Plan satisfies many of the *Caldwell II* factors. *See* Trustee's Brief, pp. 8 and 11. The commitment period of the Plan is the maximum 60 months; there is no suggestion that the Debtors have not been honest in representing their financial circumstances; the secured claims are not modified except to the extent permitted under the Bankruptcy Code; the Debtors have not filed for bankruptcy protection previously; and the administration of the Plan will not impose any unusual burden on the Trustee.

The focus of the Trustee's good faith argument is essentially that the Debtors are paying a substantial portion of their income to secured creditors to either create equity in collateral for the benefit of themselves or their family or, with respect to the Motor Home, that income is being foolishly frittered away on the depreciating Motor Home. The Trustee posits that by surrendering the Motor Home and moving into one of their parcels of real estate, the Debtors could pay a significantly higher dividend to nonpriority unsecured creditors.

The court finds that the Trustee met his burden of producing evidence in support of his objection. The evidence as to the Debtors' retention of several parcels of real estate and the Motor Home, their payment of costs related to their son and grandson, Ms. Lofty's testimony, and the court's taking judicial notice of the Debtors' Schedules (A–J), as amended, and the Statement of Financial Affairs (Docs. 1, 34, 55 & 63) support the Trustee Objection and constitute sufficient evidence to raise a good faith issue under § 1325(a)(3). Accordingly, the Debtors bore the ultimate burden of proving their good faith. *Caldwell II*, 895 F.2d at 1126; *Francis*, 273 B.R. at 91.

The Debtors did not sustain their burden of proving that their Plan was proposed in good faith. The primary area of dispute does not concern the Debtors' subjective good faith, but rather, the objective good faith of the Plan. The court finds that if the Plan is confirmed, "the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources" will not be satisfied. *Okoreeh–Baah*, 836 F.2d at 1033.

By paying the costs related to the housing of their son and grandson from their projected disposable income, the Debtors are choosing to support family members at the expense of the nonpriority unsecured creditors. That support impacts the amount of the Debtors' payments to unsecured creditors and, therefore, implicates the first *Caldwell II* factor. Thus, that support is inconsistent with the requirement that a plan be proposed in objective good faith.

In addition, the overall structure of the Plan unfairly favors secured creditors in contravention of factor 5 set forth in *Cald-*

*well II.* Even assuming the Debtors established that the son and grandson qualify as their dependents, the Debtors failed to explain why a housing option costing less than $3,000 each month (the approximate total cost of the Motor Home and the Lakeshore Property for the Debtors and their son) cannot be found for the Debtors, their son and grandson.[8] The Debtors propose to retain two parcels of real estate and a Motor Home for themselves and their immediate family, plus a separate vehicle, while only paying a 7% dividend to nonpriority unsecured creditors. The Motor Home's expenses are rather high for housing for a family of two, with the secured debt portion of those expenses alone costing $72,960 ($1,216 × 60 months) over the length of the Plan at the crammed down rate provided by the Plan (Doc. 9, p. 5). Combining the Motor Home expenses with the expenses for the Lakeshore Property, the Debtors are spending in excess of $2,400 on those two secured debts alone.

Despite the Debtors' proclamation that they "have provided factual support and testimony that their plan is submitted in good faith [and] reflects a reasonable expenditure of income and expenses under the applicable provisions of the Bankruptcy Code" (Debtors' Brief, p. 2), evidence of the reasonableness of these expenditures was lacking at the Hearing. The Debtors' Brief, pp. 4–5, states that: "The Debtors' list monthly living expenses of $3905.78 leaving $2758.00 per month for their Chapter 13 payment. The monthly expenses are definitely higher than the norm for a Chapter 13 with household of two." The Debtors then list expenses that they assert should be excluded from those expenses and conclude that their actual personal monthly living expenses are $2,474.13 and that this amount "is slightly less than the Trustee's guide line of $2500.00 per month for a household of two." While the Debtors' testimony and briefing attempted to justify their retention of the Motor Home and the two parcels of real property, the Debtors did not introduce evidence as to the reasonableness of those costs, including as to the reasonableness of the total of their living expenses and the expenses associated with the Motor Home. Even though they mention the "Trustee's guide line" regarding expenses, the Debtors failed to introduce any such guidelines or standards such as the Internal Revenue Service's National Standards and Local Standards. *See* 11 U.S.C. § 707(b)(2)(A). For Chapter 7 cases applying those standards, see *Voelkel v. Naylor (In re Voelkel)*, 322 B.R. 138, 147–48 (9th Cir. BAP 2005);[9] *In re Wadsworth*, 383 B.R. 330,

---

8. The Debtors' Brief states that "[r]etaining the Lakeshore Property provides stability to the Debtors' son and grandson who have been renting and living there for many years." The record does not provide sufficient evidence to support this broad assertion. As Judge Mullins aptly recognized in *In re Johnson*, 318 B.R. 907, 919 (Bankr.N.D.Ga.2005), a court cannot embark upon the path of determining "where the Debtor should live[,] ... the Debtor's ability to obtain other housing, the availability of housing in a particular area, the Debtor's desire to remain in a certain school district, the type of housing available, the safety of the Debtor's neighborhood, the details of the Debtor's commute to work, [or] the Debtor's sentimental ties to the home[.]" However, the court can make determinations of good faith based upon objective criteria and evidence.

9. In *Voelkel v. Naylor (In re Voelkel)*, 322 B.R. 138, 147–48 (9th Cir. BAP 2005) the court explained that it is appropriate for a court to rely on its own value judgments to determine the reasonableness of a debtor's expenses when the court is sua sponte moving to dismiss a debtor's Chapter 7 case for abuse because the court has no way of gathering or admitting evidence, provided that the court "set forth all issues to be considered at the section 707(b) hearing" so that the debtor has an opportunity to contradict the court's findings with evidence. In this case, the court is

335 (Bankr.N.D.Ohio 2007); *In re Littman*, 370 B.R. 820, 827 (Bankr.D.Idaho 2007); and *In re Ruel*, 418 B.R. 389, 392 (Bankr.D.N.M.2009) and for Chapter 13 cases in this district applying those standards *see In re Kolb*, 366 B.R. 802, 811–12 (Bankr.S.D.Ohio 2007) and *In re Anderson*, 383 B.R. 699, 708–09 (Bankr. S.D.Ohio 2008).[10]

Factor 8 of the *Caldwell II* factors also does not support confirmation of the Debtors' Plan. The Debtors wish to retain the Motor Home, continue spending the winter months in a warmer climate and support their immediate family without considering other viable options. While Ms. Lofty provided limited testimony as to her arthritis justifying the retention of the Motor Home, that evidence did not rise to the level of providing "justifiable special circumstances" (factor 8 of *Caldwell II* ) warranting the retention of a non-cash flowing parcel of real property and a separate Motor Home.

▆▆ The court would be remiss if it did not note that some facts and evidence support the subjective good faith factors set forth in *Caldwell II* and evince a sincere effort on the Debtors' part to rehabilitate their financial affairs. Specifically, the Debtors' shedding of all but the two parcels of real property (the Powers Road Property and the Lakeshore Road Proper-

ty) and cramming down of the Motor Home could potentially generate money for the nonpriority unsecured creditors. In addition, the obligation the Debtors feel to support their son and grandson, while violating § 1325(b)(1)(B) and running afoul of the objective good faith factors, displays subjective good faith. However, the Debtors' suggestion that they will stop payment to nonpriority unsecured creditors and use the funds paid to the Trustee pre-confirmation to negotiate with their secured creditors if the Plan is not confirmed since their income is exempt from execution under applicable non-bankruptcy law does not assist the Debtors. *See* Debtors' Brief, p. 7. First, no testimony or other evidence in support of this argument was introduced at the Hearing. Second, the pursuit of relief under Chapter 13 of the Bankruptcy Code is voluntary and generally the right to dismiss a Chapter 13 case (not previously converted) is unfettered. *See* 11 U.S.C. §§ 303(a) and 1307(b). The Debtors certainly may pursue such a course of action. However, such an alternative, if relevant at all, does not reflect the Debtors' "sincerely-intended repayment of pre-petition debt consistent with [their] available resources." *Okoreeh–Baah*, 836 F.2d at 1033. When alternative, feasible plans are possible that would increase the dividend to nonpriority unse-

---

not the moving or objecting party and, therefore, it need not solely rely on its own value judgments, but may instead appropriately rely on the evidence presented by the parties and the respective burdens of the parties.

10. Of course, the approach followed in *Kolb* and *Anderson* of multiplying the disposable income determined using the means test embodied in Form 22C by the months in the applicable commitment period to calculate projected disposable income has been changed by *Lanning*. See *Hamilton v. Lanning*, —— U.S. ——, 130 S.Ct. 2464, 2478, 177 L.Ed.2d 23 (2010) ("We hold that when a bankruptcy court calculates a debtor's pro-

jected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation."). Nevertheless, in cases such as this one in which the reasonableness of the Debtors' expenses are contested, the citations to *Kolb*, Anderson and other similar cases are a reminder that objective criteria, such as the IRS expense guidelines or other admissible objective evidence would provide a basis to evaluate the objective good faith of a Chapter 13 plan other than through the court's own personal experiences and knowledge.

cured creditors, the court cannot find good faith by considering that the Debtors may choose to dismiss this case and attempt to resolve their debts under applicable non-bankruptcy law.[11]

## IV. Conclusion

For the reasons set forth above, confirmation of the Plan is denied. The Debtors are granted forty-five (45) days from the date that the order on this decision is entered to file an amended plan. In the event an amended plan is not filed with that forty-five (45) day period, the case will be dismissed.

The court will enter a separate order on this decision denying confirmation with leave to file an amended plan within forty-five (45) days.

**IT IS SO ORDERED.**

---

**11.** In the event that the Debtors determine to file a further amended plan, the court is not requiring or suggesting that the Debtors modify their proposed plan in a particular manner, but is only finding the Plan as presently proposed violates § 1325(a)(3) and (b)(1)(B).